# 23-7548

## United States Court of Appeals
### *for the*
## Second Circuit

————

Shveta Kakar Kurtz, Daniel L. Kurtz, Solely in Their Roles Roles as Parent–guardians, Amna Kakar Kurtz, a Minor Child, Mia Kakar Kurtz, a Minor Child,

*Plaintiff - Appellants*,

v.

City of New York, Yscary Rodriguez, Individually and as a \Caseworker Employed by ACS, Brenda Lawson, Individually and as an ACS Case Manager/supervisor, Marie Lupica, as an Individual, Treating Physician and State Actor Operating under Color of Law, New York Presbyterian Hospital/weill Cornell Medical Center,

*Defendant - Appellees*,

David Hansell, as the Duly Appointed Commissioner of the New York City Administration for Children's Services, Division of Child Protection, Ms. Bhojranie Maygoo, Individually, and as a Caseworker Employed by ACS, Eunice Iwenofu, Individually and as a Caseworker Employed by ACS, Esperanza Sandoval, Individually, as a Supervisor in the Family Support Unit Employed by ACS, Dr. Peter Fabricant, Individually and as a Treating Physician and State Actor Operating under Color of Law, Ramzi Marwan Shaykh, Individually and as a Treating Physician, Dr. Shari L. Platt, as an Individual, as a Treating Physician and State Actor Operating under Color of Law, Sheena Ranade, as an Individual, as a Treating Physician, Licensed Social Worker Karen Glass, as a State Actor, and as an Individual, Unnamed ACS Workers and Employees 1–10, Unnamed Employees and Workers of New York Presbyterian Hospital/weill Cornell Medical Center 1–10, Unnamed Workers and Employees of Mt. Sinai Hospital 1–10, Mount Sinai Hospital, New York City Administration for Children's Services, New York Comptroller,

Defendants.
_____

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**PLAINTIFFS-APPELLANTS' BRIEF**
(Cover continued on inside)

SCOTT A. KORENBAUM, ESQ.
14 Wall Street, Suite 1306
New York, New York 10005
(212) 587-0018
Counsel for Plaintiffs-Appellants

## TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Summary of the Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Point I        The court below erred in holding that probable cause
               existed for the commencement of the Family Court
               removal proceedings because, viewing the evidence
               most favorably to the Kurtzes, a rational jury could
               find that Rodriguez and Lawson made intentional
               falsehoods to the prosecuting attorney it is vacated . . . . . . . . . . . . 23

        A.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.     The elements of the Kurtzes'
               malicious prosecution claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        C.     Neither Rodriguez nor Lawson
               are entitled toqualified immunity . . . . . . . . . . . . . . . . . . . . . . . . 37

Point II       The court below erred in granting summary judgment
               with respect to the malicious prosecution claim against
               the Hospital appellees because a rational jury can find that
               Dr. Lupica manufactured the child abuse allegations to
               defend herself against allegations of medical malpractice,
               which led to the City appellees commencing the

Family Court removal proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Point III    The trial court abused its discretion in permitting the
             introduction of evidence relating to the parents' behavior
             at the Hospital on August 8th, and Mount Sinai on August
             9th, because it was not relevant to any issue in the case and
             was used to devastating effect by the Hospital appellee's
             counsel in his closing argument . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## TABLE OF AUTHORITIES

Cases:                                                                    Page(s)

*Boyd v. City of New York*
       336 F.3d 72 (2d Cir 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Brown v. Nassau Cnty.*
       306 A.D.2d 303 (2d Dep't 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cameron v. City of New York*
       598 F.3d 50 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 21, 23, 24, 42, 49, 52

*Chimurenga v. City of New York*
       45 F. Supp. 2d 337 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Coggins v. Buonora*
       776 F.3d 108 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Cornejo v. Bell*
       04 Civ. 341, 2008 U.S. Dist. LEXIS 89597
       (E.D.N.Y. May 19, 2008), *aff'd*, 592 F.3d 121
       (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Cornejo v. Bell*
    592 F.3d 121 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Dempsey v. Masto*
    83 A.D.2d 725 (3d Dep't 1981)
    *aff'd w/o opinion*, 56 N.Y.2d 665 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Edrei v. Maguire*
    892 F.3d 525 (2d Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Estiverne v. Esernio-Jenssen,*
    833 F. Supp. 2d 356 (E.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 25, 43

*Gelb v. Board of Elections*
    224 F.3d 149 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Hope v. Pelzer*
    536 U.S. 730 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Hynes v. Coughlin*
    79 F.3d 285 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 46-47, 49

*Jocks v. Tavernier*
    316 F.3d 128 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Kaytor v. Elec. Boat Corp.*
    609 F.3d 537 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-24

*Kurtz v. Hansell*
    20 CV 3041, 2021 US Dist. LEXIS 56037
    (S.D.N.Y. Mar. 24, 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*McClellan v. Smith*
    439 F. 3d 137 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*McGullam v. Cedar Graphics, Inc.*
    609 F.3d 70 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Morse v. Fusto*
    804 F.3d 538 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29, 38

*Mullenix v. Luna*
    577 U.S. 7 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Murray v. UBS Sec., LLC*
    43 F.4th 254 (2d Cir. 2022), *rev'd on*
    *other grounds*, 144 S. Ct. 445 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Patrick v. LeFevre*
    745 F.2d 153 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 43

*Reeves v. Sanderson Plumbing Prods., Inc.*
    530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Ricciuti v. New York City Trans. Auth.*
    124 F.3d 123 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 40

*Southerland v. City of New York*
    652 F.3d 209 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . 20, 25, 32-33, 36

*Triolo v. Nassau Cnty.*
    24 F.4th 98 (2d Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Al-Moayad*
    545 F.3d 139 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 49, 50

*United States v. Anglin*
    169 F.3d 154 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. McGowan*
    274 F.3d 1251 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*
    911 F.2d 863 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Walden v. Wishengrad*
    745 F.2d 149 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31

*Washington v. County of Rockland*
    373 F.3d 310 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Washington v. Detective*
    29 F.4th 93 (2d Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Weiss v. Hotung*
    26 A.D.3d 855 (4th Dep't 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*White v. Frank*
    855 F.2d 956 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Williams v. Savory*
    87 F. Supp. 3d 437 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Wray v. Johnson*
    202 F.3d 515 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

<u>Statutes and Other Authority</u>**:**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 47, 48

**Preliminary Statement**

Plaintiffs-appellants Daniel Kurtz and Shveta Kakar Kurtz (the "parents") have two children, A.K. and M.K. (collectively the "Kurtzes"). As relevant to this appeal, they brought suit on their own behalf and on behalf of their children, primarily under 42 U.S.C. § 1983, against defendant-appellees the City of New York, Brenda Lawson and Yscary Rodriguez, who were employed at the New York City Administration of Children's Services (the "City appellees"), principally alleging malicious prosecution and violation of their constitutional rights to family integrity and freedom of association arising out of removal proceedings instituted in Family Court. The Kurtzes also asserted supplemental state law claims against the City appellees, and supplemental state law claims against defendant-appellees New York Presbyterian Hospital (the "Hospital") and Dr. Marie Lupica (collectively, the "Hospital appellees") sounding in, among other things, malicious prosecution and medical malpractice.

Following the completion of discovery, all defendants moved for summary judgment. In an Opinion and Order reported at 664 F.Supp.3d 438 (S.D.N.Y. 2023), the court below held, among other things, that probable cause existed for the commencement of the removal proceedings in Family Court. As such, the trial court dismissed all claims against the City appellees, and all claims sounding in malicious prosecution against the Hospital appellees. However, the court below

determined that summary judgment was unwarranted on A.K.'s medical malpractice claim relating to the Hospital appellees' treatment and diagnosis of her.

Following the Opinion and Order, the matter proceeded to trial on A.K.'s medical malpractice claim against the Hospital appellees. Following a four day trial, the jury returned a verdict in the Hospital appellees' favor. Judgment was entered on September 27, 2023. (Joint Appendix "(JA") 1870.) The Kurtzes filed a timely notice of appeal. (JA 1871.)

### Jurisdictional Statement

The Kurtzes brought this action under 42 U.S.C. § 1983 to enforce their rights protected by, among other things, the Fourth Amendment to the United States Constitution. As such, subject matter jurisdiction existed. On March 27, 2023, the district court (Engelmayer, J.) granted the motion for summary judgment of the City appellees in its entirety, and of the Hospital-appellees in part. Thereafter, the matter proceeded to trial, which culminated with a verdict in favor of the Hospital appellees. Judgment was entered on September 27, 2023. (JA 1870.) On October 23, 2023, plaintiffs filed a timely notice of appeal. (JA 1871.) This Court has appellate jurisdiction. 28 U.S.C. § 1291.

**Questions Presented**

1.      On the evening of August 8, 2018, the parents rushed their 10-week old daughter, A.K., to the Hospital because she had fallen to the floor after being accidentally dropped by her father.  Dr. Lupica treated her for potential injuries to the head and brain.  Approximately four hours later, Dr. Lupica discharged A.K. without qualifications and the Kurtzes returned home.  But approximately five hours later, A.K. was inconsolable.  The parents rushed A.K. to Mount Sinai, where she was diagnosed with a fractured femur and fitted with a Pavlik harness.

On August 13, 2018, Dr. Sheena Ranade saw A.K. for a follow-up visit. Following the visit, Dr. Ranade contacted the New York State Central Registry because of concerns she had about a potential fracture to A.K.'s right clavicle.

Rodriguez and Lawson were tasked with investigating the concerns of suspected child abuse that had been reported by Dr. Ranade.  Upon investigation, Rodriguez and Lawson learned from Dr. Katherine Grimm, Mount Sinai's Child Abuse Pediatric Consultant, that A.K. did not have a  fractured clavicle.  That conversation occurred more than two weeks before they filed a Removal Petition with the Family Court.

Rodriguez and Lawson also heard concerns from medical personnel affiliated with Mount Sinai that x-rays of A.K. reflected healing rib fractures.

However, no one ever claimed that the parents were responsible for any injuries she may have received. And they either knew, or ignored, that these injuries likely occurred while A.K. was in the NICU following her premature birth.

Notwithstanding this information, Rodriguez never told Dana Licandro, Esq., the Family Court attorney responsible for filing the petition seeking the removal of A.K. from the Kurtz home, that Dr. Grimm had ruled out abuse. Instead, Rodriguez falsely told Licandro that Dr. Grimm could not rule out abuse.

Rodriguez and Lawson also misrepresented to Licandro the opinion of Dr. Ranade. Specifically, Rodriguez swore in the removal petition that Dr. Ranade had reported that x-rays of A.K.'s clavicle came back inclusive of a clavicle fracture. They had not. She also swore in the petition that Dr. Ranade had told her that A.K.'s injuries were inconsistent with the explanation provided by the parents. Again, this was inaccurate.

The misrepresentations led directly to the Family Court ordering A.K. and her twin sister, M.K., removed from the Kurtz home. As Judge Frias-Colon noted, "there is a petition that the Court is really relying on to make these determinations." In light of the causal connection between the City appellees' misrepresentations and the removal of the children from the Kurtz home, did the court below err in granting the City appellees' motion for summary judgment?

-4-

2.     Dr. Lupica never suspected child abuse after examining A.K. on August 8th.  But when she was confronted on August 28th by Dr. Shari Platt, her supervisor (SPA 177-78), with the possibility she had missed the fractured femur, it was then and only then that she made this claim.  Not other medical practitioner who either treated A.K. or examined her medical records attributed child abuse to A.K.'s fractured femur.

Dr. Lupica spoke with Rodriguez on August 30, 2018, which was shortly after Dr. Platt had raised the prospect of medical malpractice with her.  In their conversation, Dr. Lupica told Rodriguez that child abuse had to be the cause of A.K.'s fractured femur because the child did not present with a fractured femur when she treated her on August 8th.  Dr. Lupica also told Rodriguez that the fractured femur was inconsistent with the mechanism of injury described by the parents.

As of August 28, 2018, Rodriguez and Lawson did not have think they had cause to seek removal of A.K. and M.K. from the Kurtz household.  But they thought so on August 30th after hearing from Dr. Lupica.

Under these circumstances, did the court below err in granting the Hospital appellees' motion for summary judgment with respect to the Kurtzes' malicious prosecution claim?

-5-

3.　Following the court below's grant of summary judgment, the matter proceeded to trial against the Hospital appellees on A.K.'s claim of medical malpractice.[1]  Before trial, A.K. moved to preclude the Hospital appellees from introducing any evidence of the parents' arguments or temperament while in the emergency room of the Hospital on August 8th, or in the emergency room of Mount Sinai on August 9th, on the grounds such evidence was irrelevant and unduly prejudicial.  (JA 1006, 1016-18.)  The trial court denied the motion on the ground that the parents' behavior on August 8th was relevant to Dr. Lupica's examination of A.K.  (SPA 67-69), even though Dr. Lupica never complained that their behavior negatively impacted her examination of A.K.  Regarding the parents' behavior on August 9th at Mount Sinai, the court below denied the motion for what seemed like similar reasoning.  (SPA 69.)

The trial court made clear that its ruling did not permit the Hospital appellees to "use evidence of the parents' behavior for any purpose other than as it bears on Dr. Lupica's course of treatment and decision-making in connection with A.K. on August 8 and Mount Sinai's treatment and decision-making on August 9[,]" or "that the parents' immature comportment in the emergency room is in any

---

[1]  The parents originally were co-plaintiffs with A.K. regarding her medical malpractice claim.  The parents later conceded this claim belonged to A.K.  (SPA 169.)

-6-

way relevant to their capacity to give truthful testimony at trial. There are other grounds on which to attempt to impeach the parents' testimony, but their behavior in the emergency room is not one of them. It does not fairly go to their credibility." (SPA 70.) Yet, that is exactly what the Hospital appellees did in their closing argument. Counsel focused the jury's attention on Ms. Kakar Kurtz's conduct at Mount Sinai to cast doubt on her credibility. (JA 1800-02.)

Given the starkly different pictures painted by the parties at trial, and the trial court's acknowledgment that the verdict could have gone either way (JA 1868), did the trial court err in denying A.K.'s motion *in limine*?

## Statement of Facts

Because this appeal involves the grant of summary judgment, the Kurtzes contend that a rational jury can find the following facts. Plaintiff-appellants Shveta Kakar Kurtz and Daniel L. Kurtz are the parents of plaintiffs-appellants, A.K. and M.K., who are twins. A.K. and M.K. were born at Mount Sinai Hospital on June 4, 2018, at 31 weeks gestation. The twins were transferred to its Neonatal Intensive Care Unit ("NICU") after birth, where they remained for approximately seven and one-half weeks. (JA 42.)

While in the NICU, Mount Sinai medical personnel performed an abdominal x-ray of A.K. on July 2, 2018, x-rays of her abdomen and chest on July

3, 2018, and an additional x-ray of her abdomen on July 5, 2018.  A.K. and M.K. were discharged from the Mount Sinai NICU on July 27, 2018.  (JA 43.)

On August 8, 2018, about two weeks after the twins were discharged from Mount Sinai, calamity struck.  Mr. Kurtz, after changing A.K.'s diaper; accidentally dropped A.K. as he was throwing the diaper in the trash.  (JA 570.) The parents rushed A.K. to the Hospital, which was closest to their home.  (JA 542.)  Upon their arrival at the Hospital, the parents reported that the father was carrying A.K. when he threw a diaper in the trash can and A.K. slipped out of his hands, straight on to her abdomen and face onto the tile floor.  They reported that A.K. immediately cried after she was dropped, remained fussy, but was consolable.  (JA 46.)

A resident of the Hospital, Dr. Ramzi Shaykh, first examined A.K.  Dr. Shaykh recommended a CT of the head to rule out an intracranial hemorrhage. (JA 46.)  Dr. Lupica, who was responsible for treating A.K. (JA 45-46), conducted a cursory examination of A.K. that lasted less than five minutes.  After examining A.K.'s head, Dr. Lupica attempted to take off her pants but cut short her examination when A.K. began howling and crying.  As a result, Dr. Lupica did not take off A.K.'s clothing and did not examine A.K.'s legs.  She did order a CT scan.  (JA 689, 693, 713-14.)

The results of the CT scan were negative. No evidence of intracranial hemorrhage was noted. A.K. remained in the ED for observation until approximately 11:30 p.m., at which time she was discharged with a diagnosis of fall, head trauma, and directions to follow-up with A.K.'s primary care physician. Dr. Lupica did not suspect child abuse based on her August 8th examination. (JA 47.)

A.K. was discharged from the Hospital at approximately 11:30 p.m. (JA 47.) After they arrived home, A.K. was swaddled and put into a onesie. (JA 700.) At approximately 3:00 a.m., Ms. Kakar went to change A.K.'s diaper and noticed that there was something wrong with the baby's left leg. A.K.'s nurse, Alica Hernandez Hughes, told Ms. Kakar that "something's still wrong; she seems to be still in a lot of pain." Ms. Kakar noticed that the baby's leg was "completely limp" and "something was very wrong." Thereafter, the parents decided that A.K. needed to return to a hospital; they went to Mount Sinai where A.K. had spent 7 weeks in NICU. (JA 701-05.)

The Kurtzes arrived at Mount Sinai at 4:55 a.m., approximately five and a half hours after they left the Hospital. (JA 47, 745.) They were informed that A.K. had a femur fracture in her left leg. Specifically, an X-ray of A.K.'s left leg revealed an acute traumatic transversely oriented fracture through the proximal to

mid-left femoral diaphysis.  Dr. Ranade recommended that A.K. be fitted in a Pavlik harness, and fit her in it, to stabilize her fracture, which she wore for approximately 6 weeks.  (JA 48, 706.)  Upon discharge from Mount Sinai, A.K.'s parents were directed to have A.K. follow-up with Dr. Ranade the following Monday a.m. and with her pediatrician the next day.  (JA 48.)

There was no evidence that A.K. suffered any new trauma between her discharge from the Hospital to her arrival at Mount Sinai.  (JA 743-46, 828.) While A.K. and her parents were at Mount Sinai, Dr. Katherine Grimm, Mount Sinai's Child Abuse Pediatric Consultant, was called by telephone, and, with the Mount Sinai pediatric team, consulted on this matter.  (JA 48.)  No one from Mount Sinai contacted ACS after A.K.'s August 9th visit despite being mandatory reporters with the State of New York.  (JA 48.)

The parents brought A.K. to Mount Sinai on August 13th, for the recommended follow-up visit with Dr. Ranade.  During a physical exam, Dr. Ranade noticed tenderness of the right clavicle and recommended genetic testing. X-Rays were taken of the clavicle, which did not reveal any fractures.  No clavicle fracture was ever diagnosed.  (JA 49.)

On August 13th, Dr. Ranade contacted the New York State Central Registry ("SCR") and filed a report of suspected abuse following her examination of A.K.

-10-

Her concern was based on tenderness to the right clavicle.

As of August 2018, Lawson was employed by ACS as a Director of Field Operations. Rodriguez was employed by ACS as a Child Protective Specialist. Rodriguz was assigned to the Kurtz matter. Lawson was her manager. (JA 43.)

Dr. Grimm, the Child Abuse consultant at Mount Sinai, was actively involved with A.K.'s care and treatment in August 2018. She treated A.K. on August 14th, the day after Dr. Ranade's report. Dr. Grimm examined A.K.'s clavicle and concluded it was not fractured. Dr. Grimm observed A.K. lift both of her arms spontaneously and observed that A.K. did not appear to be in any pain. As Dr. Grimm noted, this kind of movement was inconsistent with a clavicle fracture, and there was no point tenderness on the right clavicle. Dr. Grimm also reviewed the X-rays done of the right clavicle and did not observe a fracture. Dr. Grimm was sure that no abuse had occurred, that the femur fracture was consistent with the parents' history of the accident and that the healing rib fractures were too old to have happened in the parents' care. (JA 599-601.)

After examining A.K. and concluding that the "new injury" did not exist, Dr. Grimm had two separate telephone interviews with Lawson on August 14th. As Lawson noted about the first interview, "Dr. Grimm states that what is influencing her about this incident being accidental, is that the baby was premature

-11-

and fragile. She examined baby A.K. and when both arms were lifted, the child did not appear to be in pain." In the second telephone conversation, Dr. Grimm informed Lawson that she observed the x-rays of the clavicle and "both clavicles look the same." According to Lawson, Dr. Grimm stated, in no uncertain terms, that "no one can testify at this time to say this infant was abused." (JA 616-18.) Lawson then spoke to Rodriguez and personally conveyed the information provided by Dr. Grimm to her. (JA 622.)

As noted, on August 9, 2018, doctors at Mount Sinai had conducted a skeletal survey of A.K., which revealed callus formation on the left 4th, 5th and 6th ribs, compatible with subacute left rib fractures. (JA 48.)[2] These rib fractures appeared to be older and healing, and since A.K. was only in the care of the parents for two weeks after her NICU stay, Mount Sinai believed that these fractures must have occurred during the baby's NICU stay (JA 595), which was consistent withy Dr. Grimm's opinion. (JA 600.)

On August 14, 2018, Rodriguez, as part of her investigation, reached out to Dr. Laura Popper, A.K.'s primary care pediatrician, to ascertain her opinion regarding A.K. (JA 634.) In their conversation, Rodriguez noted that Dr. Popper

---

[2] According to Merriam-Webster's Medical Dictionary, subacute means "less marked in severity or duration than a corresponding acute state."

stated that not only it was her opinion that the leg fracture was accidental, but that A.K. had presented to the Hospital with the fracture, and that the Hospital had missed it. Dr. Popper was so sure that no abuse had occurred, she told Rodriguez that she is willing to stake her career on it. Dr. Popper further told Rodriguez that she had consulted with Dr. Grimm, and gave Rodriguez the reasons why both Dr. Popper and Dr. Grimm had concluded the children had not been abused. (JA 614-16.)

Several weeks after they first took A.K. to the Hospital emergency room, the parents took A.K. to see Peter Fabricant, M.D., a pediatric orthopedist at HSS (an affiliate of the Hospital) for examination and imaging. Following his examination of A.K., Dr. Fabricant expressed concerns about the femur fracture, noting that it could be caused either by bone disease or nonaccidental trauma. (JA 51.) Subsequently, on August 27, 2018, he emailed Shari Platt, M.D., the Chief of Pediatric Emergency Medicine at the Hospital (JA 44, 101), to express his concern that the Hospital had failed to detect the femur break. He asked "whether focusing on head trauma only happened and if so was it perhaps a systems issue that could be addressed?" Responding, Dr. Platt thanked him for sharing the information and admitted that, in fact, "it was a definite miss on [the Hospital's] part" and that she had previewed the case and "educated her attending," *i.e.*, Dr. Lupica. (JA 730,

-13-

880-81.)   The "definite miss" in Dr. Platt's email referred to the femur fracture that was subsequently diagnosed at Mount Sinai. (JA 825.)

Dr. Platt reached out to Dr. Lupica following her exchange with Dr. Fabricant, telling her that she had spoken with Dr. Fabricant at HSS and that she "thought it could have been a missed fracture." Dr. Platt asked Dr. Lupica what had happened; Dr. Lupica responded with her "side of the story." (JA 727-29.) Dr. Lupica claimed that, based on her review of A.K.'s x-rays from Mount Sinai, that "there was no way that the baby had that injury [i.e., a femur break] when [she] saw him in ER."  Further, Dr. Lupica maintained that "I watched him for 4 hours." (JA 750, 879-80.)[3]  Dr. Lupica then went one step further, adding that femur fracture "seems as though it required brute force of pressure to break," and authoritatively stated that "child abuse seems to be the diagnosis now."  (JA 880.) *No other doctor* -- including Drs. Grimm, Hoffman-Rosenfeld, Palusci, Popper, Ranade and even the Hospital's expert, Dr. Fornari -- ever concluded that "child abuse" was the "diagnosis."  Moreover, there was no medical evidence to support Dr. Lupica's claim that "brute force" must have caused the femur fracture.  There were no signs of *any* physical trauma, including cuts, bruises, lacerations, swelling

---

[3]   At deposition, Dr. Lupica claimed "it was a mistake" to refer to A.K. as a boy, and not a lack of memory. (JA 732.)

or discoloration, noted anywhere in the hospital records.  (JA 836-71; 918-79.)

Dr. Lupica made her "child abuse" diagnosis based solely on the femur fracture.

(JA 733.)

Before Dr. Platt reached out to Dr. Lupica, Rodriguez had no reason to

remove AK from the home.  As she conveyed to Sharon Glass, a Clinical Social

Worker with HSS, "it appeared the story was consistent with the injuries as

reported by Mt. Mount Sinai - fall from diaper change, healing rib fractures from

NICU stay (not sure how this makes sense?), and then finally a call when a

possible collarbone fracture was found during a follow up visit."  (JA 879.)

On August 30, 2018, three weeks after her "definite miss" of the femur

fracture, Dr. Lupica spoke with Rodriguez.  Dr. Lupica told her about her "child

abuse diagnosis."  She also told Rodriguez "there [wa]s no way the baby had a leg

fracture on the time when she was seen at [Hospital]" (JA 629-30, 649), and the

mechanism of injury provided by Mr. Kurtz "did not go along with the injury that

this child sustained."  (JA 737-38.)

Rodriguez reported Dr. Lupica's statements back to Lawson.  (JA 631-32.)

Based on this conversation, ACS set a Child Safety Conference ("CSC") for that

day, which Rodriguez and Lawson attended along with A.K.'s parents, among

others.  At the CSC's conclusion, Lawson authorized the decision to file the

-15-

removal petition. (JA 54, 623.) At the time Lawson recommended that ACS file the removal petition, she had spoken twice with Dr. Grimm on August 14, 2018, during which, as noted, Dr. Grimm had made it very clear that no abuse had occurred. Lawson was also aware that the clavicle might not be injured. Moreover, Lawson had no information to suggest the healing rib fractures were caused by the parents. (JA 624-26.) Despite Dr. Grimm's opinion that there was no abuse, and the lack of any medical evidence to contradict this finding, Lawson decided to proceed with the removal petition. Lawson never reviewed the Petition for accuracy before CPS filed it. (JA 646.)

Rodriguez provided the information that was in the Petition to Dana Licandro, Esq., who drafted the Petition. Rodriguez reviewed the Petition for accuracy and then she signed it. Among other things, "Rodriguez told the FCLS attorney, Dana Licandro, Esq., that Dr. Grimm could not determine if abuse had occurred." (JA 54.) But she did not tell Licandro that Dr. Grimm had concluded that no abuse had occurred, and did not tell her about Dr. Popper's conclusions.

The petition drafted by Licandro based upon information provided by Rodriguez contained two serious falsehoods. The petition provided as follows:

> According to Dr. Ranade, the pediatric orthopedic surgeon, the subject child A K (DOB: /18) also presented with injuries to her collarbone. Dr. Ranade reported that

-16-

      she took further x-rays and that they all came back
      inclusive. According to Dr. Ranade, the injuries the child
      A K (DOB: /18) sustained are inconsistent with the
      explanation given by the respondents.

(JA 656.)

      Rodriguez's assertion that, "[a]ccording to Dr. Ranade, the pediatric orthopedic surgeon, the subject child A K [] also presented with injuries to her collarbone. Dr. Ranade reported that she took further x-rays and that they all came back *inclusive*[,]" was false.  (JA 674.)  The City appellees admitted this was false, but claimed Rodriguez simply made a mistake because English was not her native tongue.  (JA 532.)[4]

      Next, Dr. Ranade never told Rodriguez that A.K.'s injuries were "inconsistent with the explanation given by the respondents."  What Dr. Ranade actually told Rodriguez was that there were two possible causes of the baby's fractures -- one genetic, the other abuse -- and that she could not state for sure which was the cause.  Further, Dr. Ranade told Rodriguez that the femur fracture could, in fact, have happened from the fall.  (JA 636-37.)  Thus, Dr. Ranade raised the possibility that A.K.'s injuries were either accidental and/or due to a problem with her bones.

_____

    [4]  The court below accepted Rodriguez's explanation.  (Special Appendix ("SPA") at 29-30.)  The Kurtzes demonstrate below this was error.

-17-

The Family Court prosecutor, Licandro, relied upon Rodriguez's representations regarding the fractured clavicle.  Licandro repeatedly told Family Court Judge Patricia Frias-Colon during the August 30, 2018 initial court appearance, that the clavicle fracture had, in fact, been confirmed by doctors who had examined A.K.  (JA 664, 666.)  Thus, the alleged "error" by Ms. Rodriguez was presented as an established fact to the Family Court.  And Judge Frias-Colon expressly relied upon the evidence contained in the removal Petition in deciding to remove the children from the home.  Overruling the objections of the parents' counsel, who had requested an opportunity to "correct the record" and contest these "felonious allegations," which were "fictitious," Judge Frias-Colon stated that "there is a petition that the Court is really relying on to make these determinations."  (JA 669.)

Based on the evidence contained in the Petition, the Court ordered A.K. and M.K. removed to the custody of Ms. Kakar's brother, Rahul Kakar. This removal was forced upon the parents.  If the parents did not "consent" to this arrangement, A.K. and M.K. would have been remanded to the custody of ACS and placed into foster care.  (JA 576, 667-68.)  As Ms. Kakar explained, "I consented to my brother taking them because I did not want my children go to foster care. Premature babies born ten days ago.  That was not going to happen. I consented

-18-

that my brother take them instead." (JA 577.)[5]

On April 10, 2019, after months of fighting the abuse charges, the parents filed a motion for summary judgment in Family Court. In response, the City appellees retained an expert in child abuse, Dr. Jamie Hoffman-Rosenfeld, to review the case and provide an opinion to oppose their motion. On May 2, 2019, Dr. Hoffman-Rosenfeld issued a report in which she concluded that the injuries were consistent with the parents' explanation, and that the "left midshaft femur fracture could result from a fall at 3 to 4 feet." As Dr. Hoffman-Rosenfeld explained: "though the baby came to rest face down, I believe it is plausible that the initial impact with the floor was made by the distal upper leg with the body serving as a weight, causing bending of the femur and resulting in a fracture." Indeed, this conclusion is "supported by the absence of any physical exam findings or neuro imaging findings on [her] head or face. This suggests that the cranium did not bear the brunt of this fall as the baby hit the floor." (JA 672.) On May 7, 2019, based on Dr. Hoffman-Rosenfeld's report, ACS agreed to drop all charges against the parents (JA 57.)

---

[5] Ms. Kakar's reference to her twins being born 10 days ago is either a misstatement or a mistake in transcription.

## **Summary of the Arguments**

1.      In granting the motions for summary judgment of the City appellees, the court below failed to view the evidence in a light most favorably to the Kurtzes.  The trial court ignored that a rational jury could find that Rodriguez and Lawson blatantly disregarded material evidence establishing that the parents did not injury A.K.  But like Inspector Javert, Rodriguez and Lawson were determined to catch the parents.  In doing so, they falsely told the Family Court prosecutor that Dr. Grimm could not rule out abuse when she had done so, that x-rays of A.K.'s clavicle revealed a fracture when they had not, and that Dr. Ranade had conclusively determined that A.K.'s injuries were inconsistent with Mr. Kurtz's explanation of what had occurred.  These misrepresentations led directly to the removal of A.K. and M.K. from the family home.  As such, the court below erred in granting the City appellees' motion for summary judgment on their malicious prosecution claim.  *Southerland v. City of New York*, 652 F.3d 209, 227 (2d Cir. 2011).

2.      Regarding the Hospital appellees, the court below granted their motion because it found that probable cause existed as a whole.  (SPA 33-37.) The Kurtzes demonstrate below this was incorrect.  And a rational jury could find that Dr. Lupica knowingly lied to Rodriguez about the circumstances surrounding

A.K.'s broken femur in order to protect herself against claims of malpractice. Each and every medical provider concluded that A.K.'s fractured femur was not the product of child abuse. The jury could also find that Dr. Lupica's conversation with Rodriguez was the straw that broke the camel's back. As of March 28, 2018, neither Rodriguez nor Lawson intended to file charges. But the Family Court petition was filed on March 30th, after Rodriguez spoke with Dr. Lupica on that day. Because knowingly providing false information to a prosecutor subjects that person to liability, *Cameron v. City of New York*, 598 F.3d 50, 65 (2d Cir. 2010); *Brown v. Nassau Cnty.*, 306 A.D.2d 303, 303 (2d Dep't 2003); *Dempsey v. Masto*, 83 A.D.2d 725, 726 (3d Dep't 1981), *aff'd w/o opinion*, 56 N.Y.2d 665 (1982), the court below erred in dismissing the Kurtz's malicious prosecution claim against the Hospital appellees.

3.    Before the trial of A.K.'s medical malpractice claim, the Kurtzes moved *in limine* to preclude any mention of the parents' conduct at the Hospital on the evening of August 8, 2018, or at Mount Sinai on the morning of August 9, 2018. They contended that such evidence was not relevant within the meaning of Federal Rule of Evidence 401, and any probative value it might have was substantially outweighed by its prejudicial effect. Fed. R. Evid. 403.

Judge Engelmayer denied their motion, believing that how the parents

conducted themselves on August 8th bore on Dr. Lupica's ability to examine A.K.
Regarding the parents' conduct at Mount Sinai on August 9th, the trial court held it
"relevant insofar as the circumstances surrounding the eventual diagnosis came
about and how the information and observations that led to the August 9th
diagnosis." (SPA 67-70.) Judge Engelmayer made clear, however, that such
evidence had limitations, including that the defense may not "argue that the
parents' immature comportment in the emergency room is in any way relevant to
their capacity to give truthful testimony at trial." (SPA 70.)

The trial court's justification for allowing the bad behavior evidence was
misplaced. Dr. Lupica never claimed that she had any difficulties examining A.K.
Her story from day one was that she fully examined A.K. and there was no fracture
of the left femur. Regarding the parents' behavior on August 9th, there was no
dispute that the fracture was correctly diagnosed at Mount Sinai, and the parents
never leveled any complaints about the medical personnel. Simply put, the
evidence of the allegedly bad behavior had no relevant to any issue in the case.

The evidence at trial was fiercely contested; as the trial court noted, "this
[was] a case that could have come out either way." (JA 1868.) The admission of
the allegedly bad behavior was devastating. Notwithstanding the trial court's
express limitation, defense counsel, in his closing argument, focused on Ms. Kakar

Kurtz's conduct at Mount Sinai to cast doubt on her credibility. (JA 1800-02.) It was not harmless error. *Cameron*, 598 F.3d at 66; *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008).

## Argument

### Point I

**The court below erred in holding that probable cause existed for the commencement of the Family Court removal proceedings because, viewing the evidence most favorably to the Kurtzes, a rational jury could find that Rodriguez and Lawson made intentional falsehoods to the prosecuting attorney**

In granting the City appellees' motion for summary judgment, the court below concluded that Rodriguez and Lawson possessed probable cause to commence the Family Court removal proceedings based upon the medical evidence presented to them. In reaching that conclusion, the Court below refused to draw all reasonable inferences in the Kurtzes' favor. If it had done so, it should have denied the City appellees' motion.

**A. Standard of review.**

In *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537 (2d Cir. 2010), this Court articulated fully the standards governing motions for summary judgment:

> Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim

-23-

> has merit, for the court in considering such a motion
> must disregard all evidence favorable to the moving
> party that the jury is not required to believe. In
> reviewing the evidence and the inferences that may
> reasonably be drawn, the court 'may not make credibility
> determinations or weigh the evidence. . . . In sum,
> summary judgment is proper only when, with all
> permissible inferences and credibility questions resolved
> in favor of the party against whom judgment is sought,
> there can be but one reasonable conclusion as to the
> verdict, *i.e.*, it is quite clear what the truth is.

*Kaytor*, 609 F.3d at 545. This Court reviews the grant of summary judgment *de novo*. *Id.*

## B. The elements of the Kurtzes' malicious prosecution claims.

The elements of a claim of malicious prosecution are well-known. "Malicious prosecution occurs when (1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor." *Cameron*, 598 F.3d at 63. As the court below recognized, the City appellees contended that probable cause existed for the removal proceedings. (SPA 17.)

It is beyond cavil that "when caseworkers, in their petition for removal, make intentionally or recklessly false statements that are necessary to a court's finding of probable cause, they are subject to Fourth Amendment liability."

-24-

*Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 380 (E.D.N.Y. 2011) (citing *Southerland*, 652 F.3d at 227). Where there is evidence that a CPS investigator "knowingly or recklessly" made false statements to the Family Court, as was the case here, summary judgment must be denied. *Southerland*, 652 F.3d at 227 ("[G]enuine issues of material fact exist, both as to whether Woo knowingly or recklessly made false statements in his affidavit to the Family Court and as to whether such false statements were necessary to the court's finding of probable cause."). As this Court has made clear, "[d]eceitful half-truths or the deliberate concealment of material facts may also constitute false or fraudulent information." *Morse v. Fusto*, 804 F.3d 538, 544 (2d Cir. 2015).

Here, Rodriguez's and Lawson's misrepresentations negated probable cause. They deliberately misrepresented the findings of Dr. Grimm, the pediatric child abuse specialist at Mount Sinai, and Dr. Popper, A.K.'s primary care pediatrician. Rodriguez also lied about Dr. Grimm's opinion to the Family Court prosecutor, telling her, falsely, that Dr. Grimm had not yet formed any opinion as to whether there was evidence of child abuse. Further, Rodriguez misrepresented the evidence of the alleged clavicle fracture, falsely claiming that Dr. Ranade had told CPS that the X-rays of the collarbone came back "inclusive" of a clavicle fracture. (JA 329.)

Lastly, Rodriguez falsely claimed that Dr. Ranade had told her that the injuries were "inconsistent" with the history of the accident, when, in fact, Dr. Ranade had told her that there were genetic reasons for the baby's injuries and that an accidental fall may, in fact, have caused the femur fracture. The court below excused each of these misrepresentations; in so doing, it failed to view the evidence in a light most favorable to the parents.

As noted, the initial report of child abuse to SCR entailed Dr. Ranade's concern relating to A.K.'s clavicle. Yet, no sooner had Rodriguez and Lawson been assigned to A.K.'s case that they had proof positive that her clavicle was not fractured.

Dr. Grimm, who had been involved with A.K.'s treatment from day one, personally examined A.K. at Mount Sinai on August 14, 2018. She reached three conclusions relevant to the appeal. First, Dr. Grimm concluded that the femur fracture was consistent with a fall on a tile floor, which was consistent with Mr. Kurtz's recitation of what had occurred on August 8th. Second, she noted that A.K. "had old rib fractures that can be attributed to her stay in the NICU, consistent with osteopenia of prematurity, since babies that are premature can develop fractures from routine handling at the NICU." Finally, Dr. Grimm examined A.K.'s clavicle *after* Dr. Ranade suspected a fracture and concluded that

-26-

it was not fractured. (JA 600-01.)

The jury can readily find that Dr. Grimm specifically related her conclusions to Lawson. (JA 601.) That same day, August 14, 2018, Dr. Grimm spoke twice with Lawson. In their first conversation, Dr. Grimm relayed her findings that the femur fracture was accidental. As Lawson noted, "Dr. Grimm stated she does not feel this baby was abused…Dr. Grimm states that what is influencing her about this incident being accidental, is that the baby was premature and fragile. She examined baby A.K. and when both arms were lifted, the child did not appear to be in pain." (JA 616-17.) In their second telephone conversation, Dr. Grimm informed Lawson that she observed the X-rays of the clavicle and "both clavicles look the same." As Lawson noted, "Dr. Grimm called to say that she reviewed baby A.K.'s x-rays and saw that both clavicles look the same." Dr. Grimm also told Lawson that there was no evidence that A.K. had, in fact, been abused. (JA 601.)

Rodriguez knew about Dr. Grimm's conclusions because Lawson conveyed the information to her:

Q:     Dr. Grimm told you that the femur fracture in the baby was accidental, correct?
A:     Yes. That's what I document what I documented is what the doctor told me.
Q:     Okay. Dr. Grimm also told you that the healed ribbed fractures were possibly sustained while the child was in NCU, correct? Is that correct?

-27-

A:      Yes.

Q:      Did you convey these findings to Ms. Rodriguez?

A:      Yes.

(JA 622.)  Rodriguez knew that Dr. Grimm's opinion was important, and that it was important to provide the Family Court with accurate information.  (JA 643-44.)

The jury can readily conclude that Rodriguez lied to Licandro, the Family Court prosecutor, about Dr. Grimm's findings.  Rodriguez told Licandro that Dr. Grimm had no opinion as to whether or not abuse had occurred. (JA 640.)  This claim was false.  As noted, Dr. Grimm was certain on day one that no abuse had occurred. According to Dr. Grimm "[a]t no time did I suspect or believe that A.K.'s injuries were caused by abuse. I never saw any evidence that A.K. had been, or was being, abused."  (JA 601.)

Rodriguez also failed to inform Licandro about the opinions of Dr. Laura Popper, A.K.'s pediatrician. (JA 55.)  On August 14, 2018, Rodriguez reached out to Dr. Popper to ascertain her opinion regarding A.K.  (JA 634.)  Rodriguez noted that Dr. Popper stated that not only it was her opinion that that the leg fracture was accidental, but that A.K. had presented to the Hospital with the fracture, and the Hospital had missed it.  Dr. Popper was so sure that no abuse had occurred that she told Rodriguez she was willing to stake her 40-year career as a medical doctor on

-28-

it.  (JA 640.)

Dr. Popper also told Rodriguez that she had consulted with Dr. Grimm and gave her the reasons why she and Dr. Grimm reached their conclusions that the children were not abused. (*Id*.) ("Dr. Popper stated the ER pediatrician, Ms. Grimm (child abuse specialist) consulted with her, last week. They all agreed the fracture of the femur is a result of the father dropping A.K. last week. Dr. Popper stated the twins were home for about a week. The only explanation for the old healing fractures is the hospital.").

Rodriguez knew it was important to give full and accurate information to Licandro, that Licandro would rely upon what Rodriguez told her, and that the information she provided to Licandro could influence her decision to file a removal Petition.  (JA 641-42.)  Despite this knowledge, Rodriguez provided Licandro with blatantly false information, telling her that "Dr. Grimm couldn't say whether or not there was abuse that had taken place." (JA 640.)  A rational jury could conclude that this was a deliberate fabrication.  *See Morse*, 804 F.3d at 547 ("[G]overnment officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly.").

Based on the above, a jury could conclude that Rodriguez deliberately omitted the opinions of two doctors whose conclusions contradicted those of Dr.

Lupica and Dr. Ranade. (JA 644-45.) As the lead CPS investigator in this matter, Rodriguez was *not* free to simply disregard the exculpatory opinions of Dr. Grimm and Dr. Popper. *See Washington v. Detective*, 29 F.4th 93, 107 (2d Cir. 2022) ("[W]e have also consistently held, as relevant here, that 'an officer may not disregard plainly *exculpatory* evidence.'") (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)); *Jocks v. Tavernier*, 316 F.3d 128,135 (2d Cir. 2003) ("a police officer's awareness of the facts supporting a defense can eliminate probable cause.").

The court below rejected the Kurtzes' arguments for two principle reasons. First, it believed that this Court had "rejected that ACS caseworkers have a duty to present exculpatory evidence in Family Court proceedings." (SPA 24.) Second, it believed that the parents had mischaracterized what Dr. Grimm had told Rodriguez. (SPA 26-27.) The first contention misstates this Court's jurisprudence. The second fails to view the evidence most favorably to the parents.

Regarding the court below's interpretation of this Court's case law, two of the three cases it cited, *Walden v. Wishengrad*, 745 F.2d 149 (2d Cir. 1984), and *Williams v. Savory,* 87 F. Supp. 3d 437 (S.D.N.Y. 2015), did not address the issue. *Walden* involved the issue of whether a Family Court prosecutor was entitled to

absolute immunity for seeking an arrest warrant from the Family Court judge.

*Walden*, 745 F.2d at 151. *Williams* involved the issue of whether the defendant

case workers conduct was reasonable given the presence of immediate harm to the

plaintiff's children.

In *Cornejo v. Bell*, 592 F.3d 121 (2d Cir. 2010), the final case relied upon

by the court below, this Court noted in passing that the claims against the

caseworkers, which sounded in their failure "to adequately apprise the Family

Court of exculpatory information[,]" failed because the misstatements were not

serious enough to overcome the defendants' entitlement to qualified immunity.

*Cornejo*, 592 F.3d at 29 (citing *van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*,

911 F.2d 863, 866 (2d Cir. 1990)). *Cornejo* (or *van Emrik*) does not hold that a

caseworker is never required to provide exculpatory information to the Family

Court prosecutor, and it does not hold that caseworkers can make material

misrepresentations. As such, *Cornejo* and *van Emrik* are inapposite because, as

detailed above, Rodriguez and Lawson made material misrepresentations to

Licandro that bore directly on the issue of whether any abuse had occurred.

The court below also characterized Rodriguez's misrepresentation of Dr.

Grimm's opinion that no abuse had occurred as "overheated." (SPA 26.) In doing

so, it relied upon Rodriguez's characterization of her conversation with Dr.

Grimm. Noting the notes were "not a model of clarity," the court below concluded

they could "comfortably be read to support the proposition that Dr. Grimm,

pending further testing, had not firmly settled on an opinion." (SPA 26-27.) But

it is the jury's role to conclude what these notes provided, and the jury does not

have to believe Rodriguez's characterization of Grimm's opinions, particularly

where, as was the case here, Dr. Grimm was firm in what she had conveyed, which

was that no abuse had occurred. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 151 (2000).

By omitting the opinions of the two doctors who believed there had been no

abuse (JA 644-45), Rodriguez deprived Judge Frias Colon of the opportunity to

make a valid assessment as to whether any child abuse had occurred, who

expressly acknowledged that she was relying upon the facts alleged in the Petition

in deciding to remove the Kurtz children. (JA 669.) *Washington*, 29 F.4th at 107

("[B]y omitting the exculpatory information in the arrest warrant affidavit,

appellants deprived the judge of the fair ability to make the necessary assessment

of whether the 'story holds water' for probable cause purposes."). In particular,

the opinions of Dr. Grimm, a child abuse specialist with Mount Sinai, would have

been highly material to the Family Court's probable cause analysis, or so a

rationale jury could conclude. *See Southerland*, 652 F.3d at 225 ("We cannot

conclude as a matter of law … that the Family Court, in deciding whether there was probable cause to believe that [there was] an abused or neglected child … would have issued the order had a corrected affidavit been presented to it.") (internal citations and alterations omitted).

Rodriguez also misrepresented the evidence of the alleged clavicle fracture. She falsely claimed that Dr. Ranade told ACS that the X-rays of the collarbone came back "inclusive" of a clavicle fracture, which was included in the petition. (JA 329.) Not so. Dr. Ranade specifically told ACS that the X-Rays were inconclusive. (JA 638.)

The City appellees claimed that this was "an error ascribed by the social worker to a misunderstanding of the word, and the fact that English [was] her second language." The court below incorrectly accepted this argument. (SPA 29-31.) In doing so, it did not appreciate the significance of Licandro's use of the "inclusive" language, both in the petition and before Judge Frias Colon, claiming that it was evidence of materiality but not evidence of Rodriguez's state of mind. (SPA 30.) Again, not so; it was evidence of both. Licandro discussed the facts with Rodriguez before drafting the petition and before having her sign it. This made a slip of the tongue or an unfamiliarity with English an implausible explanation. And Licandro, relying on what Rodriguez had told her (JA 641-42),

-33-

repeatedly told the Family Court judge that the clavicle fracture had, in fact, been

confirmed by doctors who had examined A.K. (JA 644-46.) Thus, it was clear

that the inclusion of a confirmed clavicle fracture was not simply a language error.

Rather, Ms. Licandro relied on what Rodriguez had told her (JA 641-42) and

repeatedly misrepresented this "fact" to Judge Frias Colon in support of the

Petition to remove A.K. and M.K. As such, it was for the jury to decide whether

Rodriguez did so intentionally or mistakenly. *See Patrick v. LeFevre*, 745 F.2d

153, 159 (2d Cir. 1984) ("This Court has consistently held where subjective issues

regarding a litigant's state of mind, motive, sincerity or conscience are squarely

implicated, summary judgment would appear to be inappropriate and a trial

indispensable."); *Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 342 n.3

(S.D.N.Y. 1999) ("questions of motive are traditionally for trial.").

Rodriguez further deceived the Family Court by misrepresenting what Dr.

Ranade had told her about A.K.'s fractures. Specifically, Rodriguez claimed that

Dr. Ranade had told her that the baby's injuries were "inconsistent with the

explanation given by the respondents." (JA 329.) However, Dr. Ranade actually

told Rodriguez there were two possible causes of the baby's fractures, one of

which was genetic in nature:

      Q:    Okay. Now she also told you there were two possibilities about what

was happening to A.K.; is that correct?

A:    Yes.

Q:    And one of those possibilities was that A.K. had a problem with her bones; is that correct?

A:    Yes.

***

Q:    But Dr. Ranade couldn't say for sure at that time when you spoke to her on August 13, 2018, correct?

A:    Correct.

(JA 636-37.)

Dr. Ranade also told Rodriguez that the femur fracture could, in fact, have happened from the fall. (JA 635-36.) Thus, Dr. Ranade raised the possibility that A.K.'s injuries were either accidental and/or due to a problem with her bones. Yet, Rodriguez failed to disclose either of these scenarios to Licandro. Instead, Rodriguez told the Family Court that, in Dr. Ranade's opinion, A.K.'s injuries were "inconsistent with the explanation given by" the parents. (JA 329.)

The court below determined that Rodriguez's statement regarding Dr. Ranade's opinion was not misleading because it was essentially true. (SPA 27-29.) But the court below's conclusion ignored that Dr. Grimm had unequivocally told Rodriguez that there was no evidence of abuse and that Dr. Ranade had provided alternative explanations for the cause of A.K.'s fracture. As such, a rational jury could conclude that this statement by Rodriguez was deliberately

-35-

false and misleading based on what Dr. Ranade had actually told Rodriguez during their conversation. Accordingly, the court below erred in granting summary judgment on the malicious prosecution claim. *See Southerland* 652 F.3d at 227 ("[W]e conclude that genuine issues of material fact exist, both as to whether Woo knowingly or recklessly made false statements in his affidavit to the Family Court and as to whether such false statements were necessary to the court's finding of probable cause.").

While much of the misconduct related to the removal of A.K. and M.K. rested at the feet of Rodriguez, Lawson was equally culpable. It was Lawson who made the decision to file the removal petition. (JA 623.) At the time Lawson recommended that ACS file the removal petition on August 30, 2018, she had already had the two telephone calls with Dr. Grimm on August 14, 2018. In these phone calls she was made acutely aware that Dr. Grimm did not believe abuse had taken place, and memorialized Dr. Grimm's opinion in her notes. (JA 618.)

Lawson knew that A.K.'s clavicle was not fractured. (JA 626.) Similarly, Lawson never could identify any evidence that the healing rib fractures were caused by the parents. (JA 624-25.) And Lawson never reviewed the Petition for accuracy before it was filed. (JA 646.) Based on the forgoing, a reasonable jury could conclude that Lawson's decision to recommend ACS file a removal petition

was done recklessly and in bad faith.

Because the court below found probable cause existed to commence the removal proceeding, it did not reach the issue of malice–the City appellees never questioned that Rodriguez and Lawson commenced the removal proceeding or that it ended favorably. Regarding malice, "[a] lack of probable cause generally creates an inference of malice." *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir 2003). The Kurtzes demonstrate above there was ample evidence for a jury to conclude that Rodriguez and Lawson lacked probable cause to initiate the removal proceeding, and that the Family Court's determination to remove the children was based on affirmative fabrications and deliberate omissions, which established the element of malice. *See Ricciuti v. New York City Trans. Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) ("a jury could find that probable cause for the charges against the plaintiffs was lacking, and that finding alone would support an inference of malice").

**C. Neither Rodriguez nor Lawson are entitled to qualified immunity.**

The court below also concluded that Lawson and Rodriguez were entitled to qualified immunity. It did so primarily on its determination that probable cause existed for the removal proceeding and this Court's recognition of the difficulties inherent in domestic matters. (SPA 31-33.) Here, too, the court below erred by

-37-

failing to view the evidence most favorably to the parents.

"Qualified immunity protects public officials performing discretionary functions from personal liability in a civil suit for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . . Whether qualified immunity applies turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. . . . [A] right is clearly established if it would be clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted." *Morse*, 804 F.3d at 546.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted). A case on all fours is not required to place officers on notice. Cases with fundamentally or materially similar facts are not required so long as the officer had "fair warning" that the conduct in which (s)he engaged was unconstitutional. The law can be clearly established even when "the very action in question" has not "previously been held unlawful" so long as the unlawfulness of the actions was "apparent" "in light of pre-existing law." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted). *See Edrei v. Maguire*, 892 F.3d 525, 541-43 (2d Cir. 2018).

-38-

This Court has recognized that a § 1983 malicious prosecution claim premised on a civil or administrative proceeding can proceed under the Fourth Amendment. *Washington v. County of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004) ("As we have noted, our case law does not forbid a § 1983 malicious prosecution claim premised on a civil or administrative proceeding; however, [] such claims must, under *Albright* and *Singer*, be premised on a violation of Fourth Amendment rights."). As the court below recognized in its March 24, 2021 Opinion, "the weight of authority suggests that the removal of a child from her parents, via civil family court proceedings, implicates sufficient constitutional interests to support a malicious prosecution claim." *Kurtz v. Hansell*, 20 CV 3041, 2021 US Dist. LEXIS 56037, at *37 (S.D.N.Y. Mar. 24, 2021) (citations omitted). *See Cornejo v. Bell*, 04 Civ. 341, 2008 U.S. Dist. LEXIS 89597, *33 (E.D.N.Y. May 19, 2008), *aff'd*, 592 F.3d 121 (2d Cir. 2010) Accordingly, the right to be from a malicious prosecution based upon the removal of one's children from the family home was equally established as August 30, 2018.[6]

The Kurtzes establish above that Rodriguez and Lawson withheld and/or affirmatively misrepresented the quality and nature of the evidence allegedly

_____

[6] The trial court did not afford qualified immunity because the law was not clearly established. Rather, it found that Lawson's and Rodriguez's conduct was objectively reasonable.

giving rise to child abuse to the Family Court prosecutor. Time and again this Court has recognize that such conduct strips an official of his or her entitlement to qualified immunity. *Coggins v. Buonora*, 776 F.3d 108, 114 (2d Cir. 2015) (recognizing that a law enforcement officer's fabrication of evidence requires the denial of a claim for qualified immunity); *Ricciuti*, 124 F.3d at 129-30 (reversing grant of summary judgment on qualified immunity grounds based on allegations of falsified evidence). However, qualified immunity is unavailable because of the unlawful conduct by Defendants, who fabricated evidence, and withheld material exculpatory evidence from the Family Court. And while Rodriguez and Lawson denied wrongdoing, district courts are to apply the same rules governing summary judgment when addressing motions based on qualified immunity. *See McClellan v. Smith*, 439 F. 3d 137, 149 (2d Cir. 2006).

Finally, even if the Court believes that Rodriguez and/or Lawson are entitled to qualified immunity, the Kurtzes are entitled to pursue their state law claim of malicious prosecution against the City. In *Triolo v. Nassau Cnty.,* 24 F.4th 98, 110-13 (2d Cir. 2022), this Court made clear that a government official's entitlement to qualified immunity does not redound to the benefit of a municipality, which can still be held liable under the doctrine of *respondeat superior* if a government official commits an intentional tort.

-40-

## Point II

**The court below erred in granting summary judgment with respect to the malicious prosecution claim against the Hospital appellees because a rational jury can find that Dr. Lupica manufactured the child abuse allegations to defend herself against allegations of medical malpractice, which led to the City appellees commencing the Family Court removal proceedings**

The court below also dismissed the Kurtzes' malicious prosecution claim against the Hospital appellees.  It did so because probable cause existed for the removal proceeding irrespective of Dr. Lupica's claim of child abuse to Rodriguez.  (SPA 33-37.)  The parents demonstrate above this was error, and, as such, the malicious prosecution claim against the Hospital appellees should be reinstated.

The Hospital appellees also contended that Dr. Lupica's report to Rodriguez did not constitute an "initiation" of the removal proceeding because "the evidence would not permit a finding that when Dr. Lupica made child abuse allegations to ACS, she knew these to be false."  While the court below did not adopt this argument because it found probable cause otherwise existed, it noted that the Hospital appellees "have a substantial argument on this point."  (SPA 33-35.) Because this Court can affirm based upon any evidence appearing in the record

-41-

regardless if relied upon by the district court, *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010), the Kurtzes demonstrate that the Hospital appellees' contention is incorrect.

The Hospital Appellees' "theory misapprehends the function of a screening prosecutor in relation to a malicious prosecution claim. The prosecutor's actions do not supersede the complaining officer's actions; they only determine whether the officer's actions come to fruition – that is whether the officer committed the tort of malicious prosecution, or merely *attempted* to prosecute maliciously." *Cameron*, 598 F.3d at 65 (emphasis in original). Whether under federal or state law, a person who knowingly provides false information to a prosecutor may be held liable for malicious prosecution. *See White v. Frank*, 855 F.2d 956, 962 (2d Cir. 1989); *Weiss v. Hotung*, 26 A.D.3d 855, 857 (4th Dep't 2006).

The court below strongly suggested that the Kurtzes lacked evidence establishing that Dr. Lupica did not honestly believe her opinion. (SPA 33-35.) Not so. Viewing the evidence most favorably to the parents, there was ample evidence for a jury to conclude that Dr. Lupica deliberately manufactured the child abuse allegations to escape blame for her own "definite miss" of the femur fracture.

Dr. Lupica's supervisor, Dr. Platt, admitted that the failure to diagnose the

-42-

femur fracture was a "*definite miss*" on the hospital's part in an email to Dr.

Fabricant on August 27, 2018. Rather than admit that she had missed the fracture,

Dr. Lupica doubled down, falsely claiming that there was no femur fracture when

she had examined the baby at the Hospital, and stating that "child abuse seems to

be the diagnosis now." (JA 873-82.) Thereafter, on August 30, 2018, Dr. Lupica

told Rodriguez about her "child abuse" diagnosis. A jury could readily conclude

that Dr. Lupica "falsified evidence, or otherwise acted in bad faith," which would

be sufficient to support a malicious prosecution claim against Dr. Lupica. *See

Estiverne*, 581 F. Supp. 2d at 348 ("[P]laintiff's allegation that Dr. Esernio-

Jenssen knew her report to the Central Register was false at the time she made, if

true, would be sufficient to support a malicious prosecution claim."). Dr. Lupica's

state of mind raises a question of fact, which this Court has repeatedly recognized

cannot be decided on summary judgment. *Patrick*, 745 F.2d at 159 ("This Court

has consistently held where subjective issues regarding a litigant's state of

mind, motive, sincerity or conscience are squarely implicated, summary judgment

would appear to be inappropriate and a trial indispensable."). *See Gelb v. Board

of Elections*, 224 F.3d 149, 157 (2d Cir. 2000) (same).

Finally, the court below's grant of summary judgment to the Hospital

appellees negatively impacted the trial that would be held on A.K.'s medical

malpractice claim.[7]  Before trial, A.K. moved *in limine* to recover the full panoply

of damages attributable to Dr. Lupica's malpractice.  (JA 1006, 1012-13.)  The

trial court denied that motion, primarily on the ground that it was not relevant to

any of the elements of A.K.'s remaining claim or her claim of damages.  (SPA 53-

66.)  While A.K. does not challenge the trial court's decision in the context of the

medical malpractice trial, as a result of its *in limine* ruling the trial court denied

"plaintiffs' motion to put before the jury, for any purpose, whether liability or

damages, any evidence relating to the ACS investigation or any evidence of the

allegations of child abuse."  (SPA 67.)

    With evidence of ACS' investigation and the Family Court proceeding

deemed inadmissible, A.K.'s counsel was limited in what he could do to attack Dr.

Lupica's credibility.  For example, when confronted with Dr. Platt's "definite

miss" comment, Dr. Lupica claimed her review of the x-ray left her with the belief

that such a fracture "required a brute force of pressure to break."  (JA 880.)  No

other doctor who treated A.K., reviewed her records and/or testified at trial held

such a view.  But A.K.'s counsel could not attack Dr. Lupica's credibility on this

---

    [7] A.K. limits this discussion to the impact on the medical malpractice trial
because it is obvious that a trial with the City appellees would have required the
admission of all relevant evidence relating to the ACS investigation and
subsequent Family Court removal proceeding.

claim of brute force. This was particularly problematic since Dr. Hoffman-Rosenfeld, the expert ACS retained, issued a report in which she concluded that the injuries were consistent with the parents' story, and that the "left midshaft femur fracture could result from a fall at 3 to 4 feet." (JA 672.)

The grant of summary judgment and the trial court's subsequent ruling also left the parents with their hands tied. As noted, ACS agreed to drop all charges against the parents based on Dr. Hoffman-Rosenfeld's report (JA 57). But the jury would not hear that the parents had been cleared of the allegations of abuse. Relatedly, the Hospital appellees pointed the finger at A.K.'s baby nurse as the source of the abuse. (JA 1343-46, 1370, 1396, 1802-03.) Again, the parents could not counter with the fact that all charges were dismissed. Similarly, the Hospital appellees were allowed to pursue Dr. Lupica's abuse theory, yet the parents could not counter with Dr. Grimm's contemporaneous opinion, nor with the four other medical experts (including the City's expert) that found that there were no signs of abuse.

Finally, as noted, the trial court determined that A.K. could not pursue consequential or punitive damages. (SPA 60-66.) The inability to seek punitive damages would have played a major role in the presentation of the case – *e.g.*, A.K.'s counsel would have addressed punitive damages in his opening statement

and closing argument.

## Point III

**The trial court abused its discretion in permitting the introduction of evidence relating to the parents' behavior at the Hospital on August 8th, and Mount Sinai on August 9th, because it was not relevant to any issue in the case and was used to devastating effect by the Hospital appellees' counsel in his closing argument**

Before trial, A.K. moved to preclude the Hospital appellees from introducing any evidence regarding the parents' arguments or temperament while in the emergency room of the Hospital on August 8th, and in the emergency room of Mount Sinai on August 9th, on the grounds such evidence was irrelevant and prejudicial. (JA 1006, 1016-18.) The trial court denied the motion on the ground that the parents' behavior on August 8th, was relevant to Dr. Lupica's examination of A.K. (SPA 67-69.) Regarding the parents' behavior on August 9th at Mount Sinai, the court below denied the motion for what seems like similar reasoning. (SPA 69.) But such evidence had no bearing on either Dr. Lupica's or Dr. Ranade's examination of A.K., and painted the parents in a most undesirable light, which the Hospital appellees capitalized on in closing arguments. This Court reviews a district court's evidentiary rulings for an abuse of discretion. *United States v. Anglin*, 169 F.3d 154, 162 (2d Cir. 1999); *Hynes v. Coughlin*, 79 F.3d

-46-

285, 291 (2d Cir. 1996).

At trial, the sole issue for the jury to decide was whether Dr. Lupica committed medical malpractice on August 8, 2018, when she failed to recognize and diagnose A.K.'s femur fracture, which fracturing worsened overnight because of the missed diagnosis. (JA 1077, 1082-83.) The parents' testimony was crystal clear that Dr. Lupica never examined A.K.'s lower left extremity. Ms. Kakar Kurtz testified that as Dr. Lupica started to remove A.K.'s pants she started screeching like crazy, which caused Dr. Lupica to back off. (JA 1324-25.) Mr. Kurtz testified similarly, noting that Dr. Lupica "wanted to examine her lower extremities, her legs, and started to take off her pants, and I have a picture in my mind's eye that Amna, you know, screamed loud enough to wake up the dead, and Dr. Lupica recoiled and said, you know, okay, let's just get her to a CAT scan, or something to that effect[,]" and that she never removed A.K.'s pants. (JA 1381-82.) In contrast, Dr. Lupica testified that she conducted a thorough examination of A.K. that revealed no evidence of a fractured femur. (JA 1249-56.)

Against this backdrop, the parents' affect and mood had no tendency to make any fact in this case more or less probable or in determining the action. Fed. R. Evid. 401. Dr. Lupica either failed to conduct an appropriate examination of A.K., as the parents testified, which should have included an examination of

-47-

A.K.'s lower extremities, or Dr. Lupica conducted a thorough examination of

A.K., as she contended. As A.K.'s counsel framed the issue: "Was this baby fully

stripped down and examined by Dr. Lupica in that hospital. And there is really no

middle ground on that, ladies and gentlemen. You've heard completely

diametrically opposed testimony. . . . Dr. Lupica herself admitted . . . in the very

last question I asked her that it would be a departure from accepted medical care

for an emergency room physician to not fully strip down and examine a baby. So

the critical issue is whether that actually happened." (JA 1822-23.)

Rule 401 of the Federal Rules of Evidence provides as follows: "Evidence is

relevant if: (a) it has any tendency to make a fact more or less probable than it

would be without the evidence; and (b) the fact is of consequence in determining

the action." As noted, the trial court permitted the introduction of this evidence as

bearing on Dr. Lupica's examination of A.K. But in neither scenario presented by

the parties did the parents' conduct on August 8th impact on Dr. Lupica's

examination. As such, it could not be relevant.

The trial court's explanation for why the parents' behavior was relevant to

the diagnosis on August 9th was ambiguous. While their behavior at the Hospital

could be relevant if it actually interfered with Dr. Lupica's examination on August

8th, the significance of A.K.'s treatment at Mount Sinai on August 9th was the fact

-48-

of the diagnosis of the fractured femur. Nothing more, nothing less. Because the parents' behavior in the emergency rooms shed no light on any of the issues at trial, its admission was error. *Cameron*, 598 F.3d at 62-64 (where testimony of prosecutors regarding their opinions about probable cause to arrest and prosecute had no bearing on plaintiff's claim of malicious prosecution, it was error to allow such testimony). *See United States v. McGowan*, 274 F.3d 1251, 1253–1255 (9th Cir. 2001).

Nor was the admission of such evidence harmless. Whether erroneously admitted evidence is harmless turns on whether this Court "can conclude with fair assurance that the evidence did not substantially influence the jury." *Al-Moayad*, 545 F.3d at 164 (citation and quotation omitted). Challenged testimony is harmless if this Court concludes

> that the testimony was unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. . . . One indicator of the evidence's degree of importance is whether or not the evidence bears on an issue that is plainly critical to the jury's decision.

*Hynes*, 79 F.3d at 291 (citations and quotations omitted). In assessing harmlessness, this Court also considers the following factors: (1) the overall strength of the appellees' case; (2) the appellees' attorney's conduct with respect

-49-

to the improperly admitted evidence; (3) the importance of the wrongly admitted evidence; and (4) whether the evidence was cumulative of other properly admitted evidence. *Al-Moayad*, 545 F.3d at 164. While all factors are relevant, the strength of the appellees' case is the most critical one. *See Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000).

The parties presented starkly different pictures of what occurred at the Hospital on August 8th, either of which could have swayed the jury. As the trial court itself noted, "it was a very well-tried case. To say the least, the jury got a lot of information, and two absolutely first class, first rate closing arguments. I'm quite surprised at the speed of the verdict, and what struck me is this is a case that could have come out either way." (JA 1868.) In *Murray v. UBS Sec., LLC*, 43 F.4th 254, 262 (2d Cir. 2022), *rev'd on other grounds*, 144 S. Ct. 445 (2024), this Court relied on the trial court's view of the case as being "'one of the closest [cases] [it] has ever observed[,]'" in concluding that the erroneous jury instructions were not harmless.

The Hospital appellees also used this evidence to devastating effect. They opened and closed with this evidence. In his opening statement, counsel pointed out how the parents were upset with each other and argumentative with each other while at the Hospital. While this may have been within the boundaries permitted

by the trial court, the point is that it should not have been allowed at all because it

made the parents dislikeable. During closing argument, counsel for the Hospital

appellees directly ran afoul of the court below's ruling, making devastating use of

Ms. Kakar Kurtz's conduct at Mount Sinai to paint her as a liar:

> I submit to you that if you want to assess the credibility
> of that statement by Mrs. Kurtz in the totality of the
> circumstances, you need to look no further then the very
> next morning when the child is brought to Mount Sinai
> Hospital, seen in the emergency department, and those
> records in their entirety are in evidence. They'll be before
> you, and you're free to look at them. But if you look at,
> in particular, page 193 of the Mount Sinai chart, you
> heard testimony that mom and dad got there around
> sometime after 3 a.m. So at 7:48 a.m., there's an
> emergency department progress note by a doctor by the
> name of Jonathan Mishoe, M-I-S-H-O-E, and down at
> the bottom of his note —— The contemporaneous note
> written by the doctor at Mount Sinai that morning in the
> emergency department, interestingly, about four hours
> after they had gotten there, so quite eerily similar to the
> night before at Presbyterian, Dr. Mishoe of Mount Sinai
> says, "Upon my evaluation, patient's parents refused to
> let myself or attending physician to examine the patient."
> If that doesn't give you everything you want to ——
> need to know about the sincerity of Mrs. Kurtz's
> statement, take a look at page 195 of the Mount Sinai
> chart. This is a note by a different medical person, a
> nurse, Jocelyn Galduda (ph) at about 7:45 that morning,
> and she says, "Went to see the patient to introduce as a
> nurse, will take care of the patient for the day shift. The
> parents refused for RN to assess patient. Dad stated
> loudly, get out of the room. Stood up from chair and took
> a step towards RN while pointing to the door. Left the

-51-

room and made attending Zinn made aware as well as assisting nursing manager Brandy Rex." The nurse had the wherewithal to still make some mention of the baby's demeanor despite that, and she said, "Found patient in mom's arms and was crying but consolable by mom." So I mention that for one purpose, and that's in evaluating the credibility, the candor, and the interest in this case of Mr. and Mrs. Kurtz and in what they got up and told you on that witness stand.

(JA 1800-02.)

As noted, the trial court made clear that its ruling did not permit the Hospital appellees to argue "that the parents' immature comportment in the emergency room is in any way relevant to their capacity to give truthful testimony at trial. There are other grounds on which to attempt to impeach the parents' testimony, but their behavior in the emergency room is not one of them. It does not fairly go to their credibility." (SPA 71.) Yet, that is exactly what the Hospital appellees did in their closing argument. Because this Court cannot say that the admission of the parents' behavior was harmless, A.K. is entitled to a new trial. *Cameron v. City of New York*, 598 F.3d at 66.

## <u>Conclusion</u>

For the reasons stated in Points I-II, the district court erred in granting summary judgment to the City appellees and Hospital appellees.  For the reasons stated in Point III, the court below erred in denying A.K.'s motion to preclude the introduction of evidence relating to the parents' behavior on August 8-9, 2018.  Accordingly, the judgment should be vacated and the matter remanded for trial, together with such other and further relief as is just and proper.

Dated:     March 8, 2024
            New York, New York

                    Respectfully submitted,

                    SCOTT A. KORENBAUM
                    14 Wall Street, Suite 1603
                    New York, New York  10005
                    (212) 587-0018

                    Counsel for Plaintiffs-appellants

                    By: _____
                         Scott A. Korenbaum

-53-

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 11,918 words and complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Civil Procedure.

Dated:     New York, New York
          March 8, 2024

Scott A. Korenbaum